And we'll turn to counsel in Zennie v. College Of Mount Saint Vincent. Ms. David, go ahead. Good afternoon, your honors. I may please the court. I represent the plaintiff appellant, Robert Dean Zennie. For nearly two years, Mr. Zennie acted as the head wrestling coach, as well as the assistant athletic director at the College Of Mount Saint Vincent. This followed about 20 years of corporate experience, and prior to that experience as a head coach at another Staten Island college. Contrary to the decision by the district court, Mr. Zennie was not trying to be the associate athletic director and basketball coach. He realized that he didn't have the basketball skills. But based on the history of this college, they generally linked the associate positions with the most senior people in the department. This was done in 2015. And the reason we know that is because the president, Dr. Flynn, when he was asked about that position when they needed to hire a basketball coach in 2015, he believed that that position or that new person should go in as an assistant athletic director. This thing about basketball being the prestige sport and needing only basketball coaches in the top position was really came up in the context of this litigation. It had never been this way before. If you look historically at the positions in this college, the top positions were held by a number of different sport coaches, some even non-sport coaches. Was there any evidence in the record that the decision to link the AAD position to a basketball coaching experience or position was made with Mr. Zennie in mind? I'm sorry. I also have a... Was there any evidence in the record that the decision to link the AAD position, the associate, the position that he sought, to a basketball coaching experience or position was made with Mr. Zennie in mind in some way? Did his name come up? Well, to go back... At the time that that decision to link those two things was made? That decision was made in, I believe, in January of 2017 after the firing. And it was made only after Mr. Zennie approached the dean of students to say, I'd like to step into that role. Then within several days, it was determined they're going to give it to the... Make these positions or link them. No, no, no. I think I was not clear. At a certain point, there was a decision made by the college to require basketball coaching experience, in essence, as part of this AAD position. Is that correct? They needed two basketball coaches. That's correct. All right. The men's and women's basketball coach, right? So at that point, whoever it was who made that decision, did Mr. Zennie's name come up? That is, the issue of whether Zennie was one of those people, did that even come up? I'm not sure whether or not it did. I think there is evidence in text, I don't believe they're in the appendix, where they noted that Mr. Zennie had approached Dean Pedrato seeking that position. And then within several days... But after it was created, after it was advertised as a basketball plus AAD position, correct? No. No, actually it happened prior to that. Okay. But I don't want to get too off track here, because I think that three-month period between January and April is important. He accepted the fact that if the school wanted to link the men's and women's basketball coaching position with the associate position, he was okay with it. The problem was that when he was part of the interview team, he saw the three finalists for this position. Two of them, in their 40s, met all the posting requirements. The one person that didn't, Mr. Mooney, lacked any type of collegiate experience. He was the one that was promoted. Mr. Zennie... Did he have basketball coaching experience? I'm sorry? Did he have basketball coaching experience? He had some basketball coaching experience. The other two candidates had significantly more basketball coaching experience. And the other two candidates also had what Mr. Mooney did not have, which was collegiate administrative experience. But what really happened here, though, is that the moment that Mr. Zennie went to the college and said, wait a minute, something's happening here that shouldn't be. You're turning... You're going to promote somebody over other much more qualified people that met not just the basketball coaching experience, but also the collegiate administrative experience. Dean Bedrado and Mr. Flynn, or Dr. Flynn, both acknowledged that Mr. Mooney did not have all the credentials. Now, the issue... So when Mr. Zennie made that complaint, that complaint was communicated almost immediately to the director. And the director then asked for the rationale. From that point on, Mr. Zennie was a target. Notwithstanding his good evaluation, he was disparaged by both Dean Bedrado and Burima Yeboah. To the president... How would you... What's the timeline, in your view, for Zennie's age discrimination? I would say it began effectively in April of 2017. And the reason I picked that date is because that's when he made the complaint about the hiring practices to the college. So you would agree that if we're trying to determine from the record what the evidence might be of retaliation for his filing of the complaint, we're talking about the period after April 2017, right? No, we're actually talking about it from April 2017, because that's when he... All right, from. That's what I mean. That's exactly what I said. I thought I said it. I mean, after... So after April 2017, what does the record show with respect to the allegation that there were materially adverse actions taken by the college in retaliation for that complaint? Well, to begin with, according to Dr. Flynn, Dean Bedrado and Mr. Yeboah began disparaging Mr. Zennie to senior administrators, including Dr. Flynn, notwithstanding that he got an excellent evaluation from them a month later. So let's just wait right there. So disparaging... These were the so-called disparaging emails, right? Yes. Well, among other things. This is testimony also. Okay. So Dr. Flynn testified, am I right, to concerns about his performance that predated Zennie's complaint. Is that a fair assessment of Zennie's, of Flynn's testimony? Well, actually what Dr. Flynn testified to is his name had come up, but what he did was he said that it was more likely the problems that he associated with Laura Pruitt, who was the former athletic director. He couldn't say for sure. But what he did say was that in the spring of 2017, right at the end of that semester, that Dean Bedrado and Burima Yeboah had reported that Zennie was performing in a substandard way. That he was not... He was sort of putting his work off on other people, and he was doing all sorts of bad things that wasn't in the best interest of the college. All of this happened within weeks of Mr. Zennie making his complaint to Human Resources about the hiring practices, disregarding... So this was substantially at or after April 2017? It was within days. Within days. All right. In fact, I believe it was May 21st when this was... Were there any other... Does the record show whether there were any other materially adverse actions? Yes. Taken by the college? Yes. What were those? The biggest one, I guess, were the budget cuts. And the reason for these budget cuts was never explained to them. They were supported by Dean Bedrado. Mr. Zennie was trying to build a program there. He was not getting the money allocated to his program that the other coaches were getting. But Zennie's problems with the wrestling team budget, with the budget, antedated the filing of the complaints, didn't they? As these problems, the budget cuts, they came before April 2017. No. No? No, they did not. What happened was there was a 2016-2017 leftover budget money that he wanted. They agreed they'd put it off until the summer. When the budget came out in, I believe, June of 2017, when the school year had ended, that's when he got the deep budget cuts. That's when he found out he would not be able to participate in NCAA-sponsored events. Why is this important? Because the most important thing a college coach can do at College of Mount St. Vincent is to recruit. And if you take away those tools, the primary tools being the ability to go to these tournaments to feed your athletes, okay, that was done by Dean Bedrado and Mr. Yeboah. Can I just, I mean, going to this question of whether or not there was a constructive discharge, these circumstances that you're mentioning of the change in the budget, the emails that were sent about him, although I don't know that he actually was aware of those since those weren't to him, do those really rise to the level of an intolerable work situation such that any reasonable person, in that situation, would find that they have to resign? Well, I wish it was part of the appendix, but there is some documentation text from Mr. Yeboah that thought, when he was commenting with another colleague, he thought that the letter that he got from Dean Bedrado, he was surprised that Dean had quit since this was, they were putting in places something that would set him up to be fired. That he was surprised that he didn't wait until he was fired. But in terms of, to get back to your question in terms of the constructive discharge, that's where the budget cuts come in. He would have been unable to build a program, he would have been unable to do the most important thing that this college wanted him to do, which was recruit, and that was done by Dean Bedrado and Mr. Yeboah. And the other thing I don't think we can forget is that Dean Bedrado had already made a decision to say that he would never get a promotion. If he wanted a promotion, he'd have to go elsewhere. They did not say that about the baseball coach who was being considered when they couldn't find a basketball coach to fill that spot. So yes, we do think he was being singled out. Okay, now Ms. Daly, you've reserved some time, and so let's give your friend Ms. Moore here an opportunity to address the court. Thank you, Your Honor. Thank you, Your Honor, and if I may just pick up actually on the question that you were just asking counsel about, Your Honor. The issues that the plaintiff has complained about that he, in his deposition, freely admitted were the critical issues, the key reasons that led to his decision to resign, did not include all of these additional communications that counsel has referred to and all these additional communications that counsel referred to in her briefing as well. The key issues that led to his decision to resign was over the budgetary issues that he was having with regard to the wrestling season. And the, excuse me, in his, I apologize, it was the budgeting issues, there was one instance of when he just came back from vacation. He was asked to do a presentation that he felt he did not have enough notice for. There was his belief that he was denied a promotion to the associate athletic director slash head men's or women's basketball coaching positions that Your Honor was talking about. And there was some, there was a fourth issue as well. The criticism about his performance that happened during a September 1st meeting that then sort of was the final straw that led to his decision to resign. With Mr. Bordrato. With Mr. Bordrato. With Mr. Bordrato and Burima Yeboah as were at that meeting. Now, those instances all put together, even if everything that plaintiff has complained about happened exactly as he has complained about them, this court and multiple other courts have very well said that those kinds of things do not rise to the level of intolerable that is required in order to establish a constructive discharge. There's cases cited in our briefing and there is no contrary arguments that are presented by counsel. The fact is, and as Judge Berman below found, the things about which plaintiff has complained here with regard to his decision to resign did not rise to the level that is required. And as this court has said, it's required. And even with regard to the worst of those things, the failure to promote him, counsel has pointed to a statement and in her argument, she pointed to a statement that Dean Bordrato had made that that plaintiff had already reached his peak. One, the plaintiff was not aware that that statement had even been made and therefore could not have been taken into consideration leading up to his decision to resign. But even if he was not going to have opportunity to promote, this court in, and I believe it's the Petrosino decision that is quoted and cited in our brief, this court has already held that a lack of promotional opportunity in one's employment does not create intolerable circumstances in the position that the plaintiff actually does have. And so we would submit that no, these things do not rise to the level of constructive discharge. Now, sort of flipping sides for a moment to the other main issue that is contested here is the denial of promoting Mr. Zinni to the positions that were open and being filled by the college in 2017. Those promotions were not stand-alone associate athletic director positions. They were not stand-alone basketball coach positions. They were a dual created, two dual created, two dual role positions. So I asked your friend about that. When was the decision made to link those two positions and make them a dual role position, make it a dual role position? The decision was made by Dr. Flynn in February 2017 when the positions became available as a result of some terminations and the promotion of a Remo Uboa from an associate athletic director position up to athletic director. That left two associate athletic director positions open and the position of head men's and head women's basketball coach. What evidence, if any, was there that Mr. Flynn or any other decision maker was influenced by Zinni's potential application for that position, for either position? There's absolutely no evidence that Dr. Flynn either considered or had any thought process that related in any way. So it's not as if there's, I'm just asking, there is no evidence that this was, that his linking the two roles was an effort to block out Mr. Zinni? And Mr. Zinni also admitted during his deposition, and I believe in response to the 56-1 statements as well, that he did not have evidence to show or any proof that the decision to link these positions and for the college to conduct the search to fill these positions as they were linked together was so that he would be denied promotion to the associate athletic director position. My confusion, I think, is if that is all true, as an evidentiary matter on the summary judgment record, then shouldn't the argument be that he's not even qualified? Absolutely, Your Honor. The positions that were being searched for and filled by the college had a critical component, and I understand there was some dispute whether it was the primary component or just a component, but it's clear that it was a critical component that the person who filled those two positions needed to be able to be the head basketball coach for the men's and then the women's teams. And it's undisputed, it's admitted by Mr. Zinni that he had absolutely no basketball coaching experience whatsoever. And as Judge Furman had found, he was not qualified to fill the positions that the college was searching to fill or looking to fill because he had absolutely no basketball experience whatsoever, and that rendered him not qualified. There's also undisputed evidence in the record that Mr. Zinni was not the only individual who was not promoted to these dual role positions. Now, Mr. Zinni has brought an age discrimination case. There's no dispute that he was within the protected class. At the time, he was, I think, 48. However, there are at least two other individuals who are on the same level, his colleagues, John Muller and Stephanie DeLege, both of whom were assistant athletic directors like him and had coaching responsibilities. Mr. Muller was 33 years old, even though in the briefing plaintiff said he was 31. The undisputed evidence shows that he was actually 33. Mr. Muller was 33 and Stephanie DeLege was 26. All three of those individuals, Mr. Muller, Ms. DeLege, and plaintiff asked to be considered for these positions, and Dr. Flynn said, no, this is an associate athletic director position linked with basketball. We're not going to change the nature of the position that we're looking to fill so that you as an assistant athletic director would be able to fill it with different sports. And Mr. Zinni was treated exactly the same as his two younger colleagues, both of whom, according to Mr. Zinni, were qualified for the positions that the college was looking to fill. You have Mr. Zinni within the protected class and two other individuals outside of the protected class being treated exactly the same. That in and of itself defeats the but-for causation that's required for Mr. Zinni's age discrimination claim. Excuse me. It also defeats the but-for causation that's required on the retaliation claim because there's also no evidence in the record that either Mr. Muller or Ms. DeLege made any kind of complaint about discrimination to the college. My time did just expire. I don't know if there was any questions that Your Honors wanted me to address. Absent any further questions, we thank you very much. And we'll hear from Ms. Daley. She is reserved two minutes. I'd like to make one critical point here. Mr. Zinni, in April of 2017, wasn't just simply arguing that he should have been promoted. He felt he should. But there was another bigger issue that he was bringing to the human resources. Remember, he was a participant in these campus interviews. And there were three people, Mr. Mooney and two other people, who happened to be in the protected class, who had eons more experience on both the collegiate level. Is he not claiming that he is a victim of discrimination? I'm sorry? Is he not claiming that he's a victim of discrimination? Isn't that why we're here? Mr. Zinni is claiming that he is a victim of discrimination, that he was retaliated against because he complained about the discriminatory practices at the college. So there's two prongs to what he's asking for. I'm focused on the discrimination claim. So what you're saying is that whatever qualifications he may or may not have had, he was complaining about discrimination, broadly speaking, maybe against other people, and that is the basis for the retaliation claim. Well, I think the retaliation claim is certainly stronger here, and there's more in the record about it. But in terms of the discriminatory practices, I think one of the things that we wanted to point out here is if you are seeking the best candidate for your dual associate position and basketball coaching position, then you pick the best candidate. You don't pick the least qualified candidate, which is what they were doing here. And that's one of the things that in his initial contact with the director of human resources, he pointed out, not just referring to himself, he was referring to the people that he had interviewed. What do we make of the fact that he had been hired a few years earlier in his mid-40s by the same person who he's now claiming has discriminated against him and others based on age? As an assistant athletic director, and we're not sure whether or not it was Mr. Yeboah or the person that occupied the athletic director's chair before Mr. Yeboah. There's a little confusion there. But yes, but as an assistant, it was clear that he wasn't going to go beyond being an assistant, notwithstanding his stellar performance review. Now, just before my time runs out, one of the things that I wanted to. It has run out, but go ahead. I'm sorry. Just to clarify, it has run out, but please go ahead. What we wanted to bring the court's attention to was there were a number of evidentiary objections, multiple evidentiary objections here that we don't believe that the judge ruled correctly on. He took issue, in fact, he essentially struck the plaintiff's counterstatement of fact based on arguments made that they were comprised of inadmissible hearsay and lack of authentication. These were the documents produced by the defendants from the key custodians named by the defendants. We cited to emails, we cited to their budget policies, we cited to their policies and procedures. Every single one of those, they made an objection based on lack of authentication and because they constituted inadmissible hearsay. Because of that, the judge's decision, the district court judge's decision doesn't reference any of our facts. But all these documents came in through discovery, were produced by me under my declaration. They were not unauthenticated. If anything, it was authentication by production. But I think it's important here because Mr. Zini should have had a fair opportunity to have the court consider a lot of his facts here and it didn't. If you read the district court's decision, it's like reading the defendant's brief. And I'd like the court to at least undertake a review of those evidentiary issues. Thank you, Your Honor. Thank you, Ms. Daly. It's been my pleasure to offer you some extra time and we're delighted to see both of you. Well argued. We will reserve the decision and we are adjourned. Court is adjourned. Thank you.